### PERKINS OIL WELL CEMENTING CO. v. OWEN.

(District Court, S. D. California, S. D. August 23, 1923.)

No. 114.

1. **Patents ⚫297(8)—Acquiescence in patent may afford basis for preliminary injunction.**

   Prior decrees establishing validity of complainant's patent, though entered on stipulation, are available as evidence of acquiescence, to afford a basis for the granting of a preliminary injunction.

2. **Patents ⚫296—General acquiescence in validity may warrant granting of preliminary injunction.**

   Acquiescence for eight or nine years in the validity of complainant's patent, by large users, and their use of the patented process, may supply the requisite basis on which to rest an order for a preliminary injunction against an infringer.

3. **Patents ⚫328—1,011,484, for method of cementing oil wells, held infringed.**

   The Perkins patent, No. 1,011,484, for method of cementing oil wells to exclude water, *held* entitled to a liberal construction, and claim 2 *held* infringed, on application for preliminary injunction.

In Equity. Suit by the Perkins Oil Well Cementing Company against J. M. Owen. On motion by complainant for preliminary injunction. Granted.

Lyon & Lyon, of Los Angeles, Cal., for complainant.
Westall & Wallace, of Los Angeles, Cal., for defendant.

JAMES, District Judge. Application for preliminary injunction restraining defendant from infringing letters patent 1,011,484. Plaintiff's patent covers a mode or process of placing cement about and around the casing used in an oil well, for the purpose of preventing water from entering the well cavity.

In determining whether the injunction should issue, there are to be considered the two main questions: (1) Is the validity of plaintiff's patent clear? (2) Do the acts being committed and threatened to be committed by the defendant, amount to infringement? Plaintiff contends that the first requirement has been sufficiently satisfied, in that it has shown, in aid of the presumption of validity which attends the issuance of its patent, that in two suits against other parties the patent has been determined to be valid, and further, to the same end, that the evidence heard in one of those cases, tried in the District Court of

this district, and which evidence is exhibited as a part of the showing on this application, establishes acquiescence of the public in recognition of the patent right for a number of years preceding the commencement of this suit.

[1] In that connection it is shown that on June 11, 1923, the late Judge Trippet of this court, after trial had, entered a decree in the case of this plaintiff against Wilson B. Wigle and Vasco B. Cottengim (Eq. No. F–70, no written opinion filed), adjudicating plaintiff's patent to be valid, and ordering an injunction to be issued restraining defendants there concerned from committing acts of infringement. It is further shown that on the 12th day of March, 1923, in the Eastern district of Oklahoma, this plaintiff obtained a similar decree as against different defendants. The last-mentioned decree appears to have been entered pursuant to a stipulation, and, if by reason of that fact it was deprived of the strength which would be attributed to a formal adjudication, it is nevertheless available as evidence under the head of acquiescence. Wilson v. Consolidated S. S. Co. (C. C. A. 1) 88 Fed. 289, 31 C. C. A. 533.

[2] The record of the testimony given in the case against Wigle et al. substantiates the claim that for a period of eight or nine years at least many oil development companies, among them being some of the largest operating throughout the United States, have used plaintiff's patented process and have recognized the patent claims. A showing of the facts adverted to seems to supply a requisite basis upon which to rest an order for a preliminary injunction, provided the proof offered shows that defendant is infringing plaintiff's process and is likely to continue so to do. Walker on Patents, § 665; General Elec. Co. v. Mallory & Co. (D. C.) 286 Fed. 175; Rousso v. First National Bank et al. (C. C. A.) 287 Fed. 273.

It may be here suggested that it was not claimed on the defendant's behalf that his financial responsibility is such as to assure plaintiff, in the event of its success in this action, satisfaction for any damages that might be sustained; neither was it offered on behalf of the defendant to furnish a bond to protect plaintiff in any recovery of damages for infringement.

[3] Defendant's main defense against this application is that of noninfringement. He has made the claim that, while adopting in part the process of plaintiff, he has so varied the operation as to clearly avoid any of the claims protected under the patent right. A consideration of this defense makes it necessary that a somewhat detailed description be given of both the process described in plaintiff's patent and that used by the defendant.

It appears from the evidence presented that, prior to the date of plaintiff's patent, application for which was filed on October 27, 1909, no sure or generally effective method had been devised for the shutting out of water from oil wells; that a flow of water into a well producing oil makes an emulsion or mixture which practically renders valueless the well, by destroying its product. It was therefore a matter of outstanding importance, a thing which marked the difference between success and failure in the oil industry, that a method be devised by

which water could be prevented from mixing with the oil. Efforts in that direction had developed a crude process, which was at times effective, but many times not. That was to drop bags of cement to the bottom of the well (sometimes amounting to several tons), and then break up the bags by the use of iron tools used for the purpose of drilling.

Strata of water sands are generally encountered above the strata of oil sands; the former being ordinarily separated from the latter by impervious strata of rock or shale. The water, between its confining strata, may be under considerable pressure, as is illustrated in the case of artesian wells, where the pressure operates to eject water above the surface of the ground. As the drilling of an oil well progresses, and the drilling tools perforate the confining strata above and beneath the water-bearing sands, the water floods in and around the well casing and will follow the drilling tools. If this condition is permitted to accompany the drilling up to the point that the oil sands are entered, the water and oil become mixed together. It is apparent, therefore, that the natural endeavor of the well driller must be to seal off the water in some way, so that it cannot enter the oil sands.

This is ordinarily accomplished by cementing fast the first line of casing that has been run into a well (called a "water string") before the stratification overlying the oil sands has been broken up by the drilling. If the operator succeeds in securing, by putting cement around his casing at the landing point determined for the water line string, a cement seal, he proceeds to drill down into the oil sand, using a second line of casing smaller in diameter, placed inside the water line, and extending from the surface of the ground. Perkins, the organizer of plaintiff corporation, was experienced in oil well drilling, and, having observed the poor success which attended the crude methods theretofore used in cementing oil wells, devised his process, which soon went into general use, and which has apparently continued to be recognized as the standard and best method. Briefly, he proceeded as follows:

After the drilling of a well had progressed through the water sands and to a suitable depth below, which might vary according to the character of the supporting strata, the casing was lifted a foot or more (the exact distance not being important), and what was known as a "tight head" attached to the top thereof. Water was then pumped into the casing, and this water, because of the pressure of the pump, proceeded downward through the casing and out the bottom of it, returning to the surface from around the outside of the casing. This part of the process was called "establishing circulation." It was for the purpose of making sure that the cement which was to follow the water would find free access to cavities outside of the casing, and in the end seal tightly the broken stratification underlying the water sand against the casing wall.

Free circulation of the water, or mud and water, which was sometimes used, about the outside of the casing, being established, Perkins inserted a plug at the top of the casing, which closely fitted the cylinder, and on top of this pumped his mixed cement to the quantity desired. By the force exerted by the pump, the cement entering the casing

forced the plug downward against the water remaining there, and, when sufficient cement had been pumped into the casing, another close-fitting plug was placed on top of it, and, by use of the pump, the cement cartridge was forced to the bottom of the casing. Necessarily the water ahead of the first plug would be forced outside of the casing. As the first plug reached the botton of the casing, it emerged therefrom and released the cement, which, under the continued pressure applied at the top of the upper plug, was forced out and up and around the outside of the casing.

Ordinarily Perkins placed a piece of timber in the cement just under the second or top plug; the timber being several feet in length. This timber served as an indicator, and prevented the upper plug from escaping from the casing at the bottom of the hole. As the lower end of this timber encountered the bottom of the hole, it prevented the upper plug from moving any farther, and the fact that the cement had been landed was indicated above the surface of the ground by the pump stopping when it was unable to force the plug any farther. The casing was then lowered to the bottom of the hole, the pressure above the top plug being maintained by shutting off the stopcocks leading to the pump on the tight head, and the well was allowed to stand undisturbed until the cement had set. The outside casing was not again moved, but drilling would proceed as before indicated; the drilling tools first passing through the cement that usually remained inside the lower end of the casing.

The case decided by Judge Trippet recognized particularly claim 2 of plaintiff's patent as being entitled to protection. That claim reads as follows:

"2. The method of cementing oil wells which consists of forcing cement down through the regular well casing by means of water pressure, the water being separated from the cement by a suitable barrier, forcing the cement up outside the casing, and holding the cement in position under the water pressure until the cement hardens."

Wigle, one of the defendants in the case last referred to, had obtained a patent on a method of cementing an oil well (his application being filed October 16, 1909), wherein he used a tight head, but carried his cement all the way to the bottom of the well by means of a tube or pipe, into which the cement was fed by a pump. His recognition of the advantages of plaintiff's patent process over his own is shown by the fact that he adopted the Perkins method in its general features, except that he did not use a bottom plug, and discarded his own. The defendant here is shown to have done as Wigle did, using Perkins' plan, but omitting one (the bottom) plug.

The defendant seeks to further differentiate the process followed by him by showing that the single plug that he uses is equipped with dogs, which will, when the plug reaches its position at the bottom of the casing, grasp the walls of the latter and maintain its position against the pressure of the cement ahead of it, without the pressure established by the pump above it being maintained. A further differentiation is claimed in that defendant puts on top of the plug a quantity of cement.

From the facts stated it will appear that the invention of the Perkins patent brought to the oil-developing industry a process entirely new and novel, and one more effective than any means theretofore devised to accomplish the same result. The advantages of the process caused its use to become general and widespread. These last observations are pertinent to the point that the claims of the Perkins patent are entitled to liberal construction, to secure to the inventor protection against those who would appropriate the substance under the guise of having changed the form. As was said in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 Sup. Ct. 322, 67 L. Ed. 523:

"In administering the patent law, the court first looks into the art, to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction, * * * to secure to the inventor the reward he deserves." Kings County Raisin & Fruit Co. v. U. S. Consol. S. R. Co., 182 Fed. 59, 104 C. C. A. 499.

The force of the rule that, to constitute infringement, there must be substantial identity of function, operation, and result, must of course be admitted. Walker on Patents, par. 335; 1 Hopkins on Patents, pars. 284, 286, 290, 291. A case is made out where it is shown that defendant has infringed any one of several claims made in a patent. Walker on Patents, par. 339. In 1 Hopkins on Patents, par. 290, the author states:

"The patentee is entitled to claim, not only that which he precisely claims, but, where he claims a combination or process embodying the use of several elements, his claims will include such combinations and processes as adopt substantially the same means, where the variation is only such as common intelligence in that art would suggest."

Under claim 2 the patentee declares his process to be:

"The method of cementing oil wells, which consists of forcing cement down through the regular well casing by means of water pressure, the water being separated from the cement by a suitable barrier, forcing the cement up outside the casing, and holding the cement in position under the water pressure until the cement hardens."

Under this claim it does not seem that a second or lower plug is necessarily included in the process. The use of the upper plug as a barrier between the pressure water and the cement which the plug forces ahead of it does seem indispensable. The evidence showed that the great advantage of using the plug on top of the cement to be placed, and applying the water pressure behind it, over the method of feeding the cement to the bottom of the hole by means of a tube connected with the pump, is that a great deal of time is lost when the cementing operation is done by the tube process in placing and removing the tube, and that the loss of this time is important, because of the advantage gained in setting the casing quickly after the cement has been deposited in position and leaving the hole undisturbed pending the setting of the cement.

Defendant claims that, by putting some cement on top of the plug, behind which pressure is applied, he has varied the process; but the evidence does not establish that this cement performs any useful func-

tion, or performs a function to bring about the desired result, in a way not accomplished by Perkins' method. The essential principle of the Wigle method and that made use of by the defendant has substantial identity with the Perkins patent. The defendant's effort, as was that of Wigle, is quite plainly one of an endeavor to make use of all of the superior advantages of the Perkins process.

It was also asserted at the hearing that defendant did not hold the pressure established against the tight head by the pump during the time allowed for the cement to set. Direct issue was taken with him on this point by several persons, who presented affidavits wherein it was stated that affiants had observed defendant at work in several instances, at times just prior to the hearing, and that he had in all cases held the pressure against the head by shutting off the stopcocks connected with the latter. Considering all of the circumstances shown, and if it be conceded that under claim 2 the holding of the pressure while the cement is setting is an indispensable step in the process, as to which a definite decision need not now be announced, the conflict of that evidence may well be resolved in favor of the plaintiff.

It is ordered that preliminary injunction be issued restraining defendant from all acts by which plaintiff's patent rights are infringed, upon the furnishing by the plaintiff, for the protection of the defendant, of a bond in the sum of $50,000, with sufficient sureties to be approved by the court.