## OWEN et al. v. PERKINS OIL WELL CEMENTING CO.

Circuit Court of Appeals, Ninth Circuit.

February 10, 1930.

No. 5927.

See, also, 293 F. 455, 759; 2 F.(2d) 247.

Westall & Wallace, of Los Angeles, Cal., for appellants.

Lyon & Lyon, Frederick S. Lyon, Leonard S. Lyon, and Henry S. Richmond, all of Los Angeles, Cal., for appellee.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge. This is an appeal from an interlocutory decree entered January 23, 1928, adjudging claim 2 of let-

ters patent 1,011,484, granted December 12, 1911, to Perkins and Double, valid and infringed, and directing an accounting, and, from the final decree in pursuance thereof, awarding judgment against appellant for $16,250, with costs. Appellant claims prior use, no invention, and no infringement. The patent is for a method of cementing oil wells in order to prevent water from water-bearing strata above the oil strata from entering the oil strata by flowing down the well outside the casing. The cement in liquid form is forced into the space between the casing and the wall of the well and held there until it hardens, thus forming an impenetrable barrier to the flow of water. The purpose of the method invented by the appellee is to make certain that the cement introduced through the casing reaches the outside of the casing, filling the space between the casing and the wall of the well, and that it is held in that position until it hardens. The process or method described in claim 2 of appellee's patent, which was found valid by the lower court, is as follows:

"2. The method of cementing oil wells which consists of forcing cement down through the regular well casing by means of water pressure, the water being separated from the cement by a suitable barrier, forcing the cement up outside the casing, and holding the cement in position under the water pressure until the cement hardens."

In the preferred method shown by the patent application, two barriers are used, first, separating the cement from the water below, and, the second, separating the cement from the water above. In cementing a well, the circulation is first established by pumping water into the casing which flows down the casing and up through the space between the casing and the wall of the well to the surface. By this process the space in the well outside the casing is cleared of obstructions, so that the circulation can be continued until the cement is in proper situation, and so that the space to be occupied by the cement will be clear. Sufficient cement is introduced into the well between the two barriers so that it will fill a space of four or five hundred feet in the well outside the casing when in position. In process of cementing, the casing is lifted slightly from the bottom of the hole so that there will be a free flow of cement from the bottom of the casing around its lower end and up the outside of the casing for several hundred feet. In the preferred method of the patent, a lower barrier, or plug, is placed in the cas-

ing first to separate the cement from the water below, and the cement is pumped in on top of this barrier, and then the upper barrier or plug is placed in the casing to separate the liquid cement from the water above. Water is then pumped in on top of the upper plug until the cement reaches the desired place in the casing and outside of it. The lower barrier preferably should be long enough so that, when the lower end strikes the bottom of the well, the upper end will still be inside the casing, with openings in the head of the barrier to permit the cement to flow through the barrier and around the bottom of the casing until the upper barrier comes in contact with the lower barrier and completely stops further circulation, stalls the pump, and shows that the cement is in proper position whereupon the casing is lowered nearly to the bottom of the well and held there until the cement hardens. A tight head upon the upper end of the casing shown in the drawings of the patent, also tends to hold the cement in place, in effect adding the weight of the casing to the column of liquid contained therein to offset the outside hydraulic pressure. The upper barrier, shown in the drawings of the patent, is that above described in the preferential method, instead of being a mere plug, it has a long spacer attached so that, when the lower end of the upper barrier comes in contact with the lower barrier already in place, the head of the upper barrier will be well inside the casing and at a considerable distance from the lower barrier, thus assuring that the lower end of the casing will be filled with undiluted cement.

It will be observed that in the claim 2 of the patent the character of the barrier is not described. It is argued by the appellant that the novelties, or inventions, if any, involved in the particular kind of barrier shown in the patent, is not only not claimed in the patent, but, if novel, is thereby dedicated by the patent itself to the public. Following up this contention, appellants claim that the only useful function of the barrier is that of an indicator; that is to say, when the upper barrier comes in contact with the bottom of the casing or with the bottom of the well, or with the lower barrier, as the case may be, according to the method used, it immediately prevents the further passage of the liquid cement from the casing, and thus so increases the pressure against the pump that the pump stalls and at once indicates on the surface that the barrier has reached the bottom of the well and that the liquid cement is in proper position. It is claimed by the appellant that the upper barrier is utterly useless for the

purpose claimed in the patent, namely, that of separating the water from the cement. The process used by the appellant is admittedly identical, in that the casing is raised from the bottom of the well, circulation is produced around the bottom of the casing and outside thereof to the surface, cement is pumped into the well, a barrier or plug is used. Appellant uses no lower barrier to separate the cement from the mud or water below it. Appellants' process is differentiated from the patent in that, after sufficient cement is pumped in below the barrier, or plug, to cement the well between the outside of the casing and the wall of the well, additional liquid cement is pumped in on top of the barrier, and thus the fluid above the barrier is liquid cement and above that is mud. Appellants' plug has on it four dogs, or ratchet pauls, which during the process of pumping the cement down, tend to prevent the plug from rising in the well. When the plug reaches the bottom of the casing, the pauls spread out below the shoe of the casing, and thus has added strength to resist the upward pressure from the column of liquid cement, and of mud or water above it on the outside and thus to prevent the liquid cement from flowing back into the casing.

It is contended that the use of the fluid mud instead of water differentiates the method of the appellants from that of the patent. It is difficult to consider this latter claim very seriously. The water in appellee's patent is first used as a ramrod is used in a gun, to force the charge of liquid cement home. After the cement is in place, it continues to operate to hold it in place, remaining in the casing to balance or offset the outside pressure. The advantage of using fluid for this purpose is that it can be pumped into the casing. It can thus be forced through a comparatively small opening and considered as a ramrod, can be lengthened indefinitely at will by merely pumping in more water. The fact that earth is mixed with the water in the appellants' process is of no more significance than if coloring matter was mixed with the water and the fluid was called ink. The fluid in the casing is still water and nothing else, for the earth is not fluid. It is true that, by the addition of earth to the water, the weight of the column in the casing is increased. Where the fluid outside of the casing is mud, thus heavier than clear water, it is desirable, if not essential, that the same additional weight should be added to the column inside the casing in order to balance the outside pressure and thus hold the cement in position when it has finally arrived at the place where it is desired that

it should harden and remain permanently. The method used by the appellant then is the identical method described in claim 2 of appellee's patent, with perhaps the improvement that in deep wells in which mud is used in the drilling operations, so that the fluid outside the casing is mud, a similar fluid will be used inside the casing. The appellants also claim that the plug used by them is not used as a barrier at all, because it has cement above it as well as below it. The fallacy in this contention arises from the fact that, until it hardens, the liquid cement above the plug is not substantially different from the liquid mud, except that it is somewhat heavier. Aside from its weight, therefore, for all practical purposes, like the mud, it is the equivalent of water, and is largely composed of water. The plug used by the appellant separates the cement below it from the mud or water above it, just as appellee claims for his barrier, and thus fulfills the function of the barrier or plug in the appellee's patent. It may be true that, in addition to this, the cement above the plug tends to secure in the pipe a known quantity of cement. This cement, however, is eventually drilled out of the casing. During the process of cementing the hole, it performs no function which differentiates it from the water called for by the method set forth in claim 2 of appellee's patent.

We understood appellants, in the oral argument, to claim that their method was vitally different from that of the appellee's because of the use of the dogs on the Inskeep plug used by him, permitting the removal of the column of water during the process of hardening of the cement, and thus permitting the resumption of drilling much sooner than the method claimed in the appellee's patent; in short, that instead of holding the cement in place by the weight of the column of water plus the barrier, appellants hold the cement in place by the mechanism of the plug or barrier itself. No such claim, however, is made in the briefs, and such a contention is characterized as absurd, for the reason that in all drilling operations the casing is filled with water or mud at all times. What the appellant does claim is that the resistance of the dogs on his plug will permit the removal of the tight head from the upper end of the casing immediately after the cement is placed. In short, appellants claim that the resistance of the plug to the invasion of the liquid cement in place outside the casing is sufficiently great to compensate for the additional pressure which would be obtained by the tight head or by the pump pressure which

is retained by the tight head. It appears from the evidence that this form of plug used by the appellants will withstand a hydrostatic pressure of not more than 100 pounds to the square inch, so that in deep wells, where the pressure is as high as 2,500 pounds to the square inch, the resistance of the plug itself to the upward pressure of the column of mud or water and cement outside would be comparatively negligible.

It is sufficient answer to the claim that the ratcheted plug takes the place of and compensates for the absence of the tight head used in appellee's method, to point out that claim 2 of plaintiff's patent does not count upon the tight head at all as a part of the method essential to holding the concrete in place, but relies upon the barrier, whatever its construction may be, plus the weight of the column of water, to effect this purpose, and this is exactly what appellants claim their process or method accomplishes.

Appellants claim that, inasmuch as the drawings and specifications show the use of a tight head in appellee's method, the broad claim 2 is limited by that fact. With this proposition we cannot agree. There is no indication in the patent that the patentee considered the maintenance of a tight head and pump pressure essential to keep the liquid cement in place while it hardened. Nor is it essential. If the appellee's patent is valid, it is infringed by the appellants' method of cementing an oil well.

█ We will next consider the validity of the patent. The patent itself is prima facie evidence of the novelty of the invention claimed, and this presumption is supplemented by the overwhelming proof that, after the invention, the plug method was almost universally used in all the oil fields of the country and throughout the world. Indeed, appellants' claim to the prior use, which will hereafter be discussed, is based upon the proposition that as early as 1908 the plug method was almost universally used in Louisiana. The plug there consisting, at first, of cement sacks tightly wadded together, supplemented by sacks filled with shale forced down on top of the cement to the bottom of the well, and later a wooden plug was used. That such a method was used in Louisiana is fully established by the evidence. It is also clear the use began about the same time the appellee's method was used in California. The principal difficulty on the question of prior use is that of the time when the use began in Louisiana and not the fact of the use.

After the preliminary injunction ([D. C.] 293 F. 455) in this case, appellants continued to use the plug method in violation of the injunction, as the court thereafter determined in the contempt proceeding, for which a fine of $3,591.25 was imposed and paid. In view of the abundant evidence in the record of the almost immediate and universal acceptance of the plug method of cementing oil wells, it seems unnecessary to extend this opinion by stating that evidence. It should, however, be stated that in the customary method of drilling oil wells in California, when the cementing is to be done, the driller, whether owner or contractor, usually procures the services of the appellee to do the work. The appellee has maintained its monopoly in California and in some of the other fields, and has shared that monopoly in still others. The cementing contractor completes his work in a few hours with a specially constructed apparatus. It is because of this method of doing business that the judgment in this case, based upon the infringement of appellee's process, is for the amount of $50 per well, although the utility of the well and the value of the oil field itself is at stake in the successful cementing of the oil well. The trial court was amply justified in its conclusion that claim 2 of the patent in question was a useful invention. Indeed, under the evidence, it is impossible to arrive at any other conclusion, in view of the immediate and well-nigh universal acceptance of this process in lieu of cementing theretofore used. These old methods are described in the record to show the prior state of the art at the time of the appellee's invention. We think it unnecessary to enlarge on that subject in this opinion. Suffice it to say that one of the methods was by forcing bags of dry cement to the bottom of the pipe and there breaking them up in the hope that they would unite with the water there and form a cement barrier at the bottom of the pipe. Another method was to introduce the cement through a pipe inside the casing, reaching from the top to the bottom. This method had certain disadvantages which need not be discussed in this opinion. It was in view of the great importance to the industry of the shutting off of the water from the oil strata that appellee's invention found such ready acceptance. With hundreds of thousands of dollars, indeed millions of dollars, at stake, even a slight improvement in method and more certainty in operation would find ready acceptance. There is no serious doubt that the appellee invented a useful method for cementing oil wells and that claim 2 in the patent properly describes that invention.

With reference to the question of prior use, notwithstanding the issuance of the patent and the presumption of priority arising therefrom, and the overwhelming proof of the adoption of this method, at about the time of the invention, appellants advance with the utmost confidence their claim of a prior use in the state of Louisiana. There is definite and positive testimony that the plug method was used in the state of Louisiana, not only before the issuance of the patent to the appellee, but before the application therefor, and as early as 1908. This testimony comes from numerous witnesses, who, if they are given full credence, would establish such prior use. There was also, however, a large volume of testimony introduced by the appellee upon that subject. Appellants claim, however, that there is no real conflict between the testimony of his witnesses and those of the appellee; that his witnesses establish the positive fact of such prior use, while the appellee's witnesses merely establish that the particular witnesses in question did not observe or know of such use; in other words, that such testimony is purely negative. This view, however, cannot be sustained. As the testimony upon this subject is very voluminous, it will be impossible, within reasonable limits of an opinion, to discuss such evidence in detail.

The appellants offered evidence as to prior use at certain specified dates and on certain specified wells in the state of Louisiana. The appellee met this evidence by testimony of witnesses concerning most of the wells presented in the testimony of the appellant. Such evidence was adduced by owners of the land upon which the wells were located, by owners of the leases under which the wells were drilled, and by drillers and laborers at the well. In the case of the various wells, the evidence of both appellants and appellee vary; appellee's evidence in some cases being much stronger and more persuasive than in others. The cementing of a well is a matter that takes some time and involves some difficulties, and cannot ordinarily be done so speedily or so secretly that those on or in the vicinity of the well will be unaware of the fact of the cementing of the well or the method used. The cement must have time to harden before operations are resumed. On a certain well in Louisiana, the drilling contractor testified positively that the plug method of cementing the well was used. Another witness, who was on the job at the time and who had equal opportunities for observation, testified that the well was cemented, but that the cement was introduced through a pipe lowered into the casing—an old method. In another case where the contractor testified that the well was cemented by the plug method, other witnesses testified that it was done by a method known as siphoning, in which the cement was forced into the casing until it began to appear at the surface outside the casing. The principal and most positive evidence of the prior use comes from the witness Hearne Harper, a member of the oil well drilling firm of McCann & Harper. This witness testified, among other things, as follows: "Q. Now, can you say how wide was the knowledge of this method of cementing in this field in 1908 and '9? And by this method I mean the plug method through casing you have described as having been used on Christian No. 1 well, for instance, and in giving your answer you may state generally how you know of the fact. A. Well, as oil men we would meet frequently around the hotels here and out in the field, and we talked about cementing. Of course, that was a big object here in setting the casing, and as I say, in meeting each other around at boarding houses and hotels around we talked about cementing, and the easiest way to do it, and we told what experience we had had on the Pardue and Christian by the use of plugs, and that was the easiest way, and it is natural for drillers or roughnecks, if they can find an easier way to do anything, they want to do it that way, and the plugs was the easiest way of cementing, and it was natural they wanted to do that this way; they wanted to cement their wells—wanted to do their work that way. They all knew about it."

This was in accord with the position of counsel for the appellants, as stated by Mr. Westall, as follows: "I might state to counsel that we take the position that this was common knowledge throughout the fields and that it was a matter of common public interest that everybody knew about and talked about."

Other witnesses testified to the same general effect, that the plug method of cementing off water-bearing strata was in general use in the Louisiana oil fields as early as 1908 or 1909. In view of this testimony of Hearne Harper, evidence given by him and by his partner, J. B. McCann, in a trial occurring in June, 1911, is particularly significant because of the fact that the suit was brought by McCann & Harper to recover the contract price for drilling an oil well for Bush Everett Company, for which that company refused to pay them on the ground that the well had been ruined by their unsuccessful attempts to cement the well. This testimony shows that

McCann & Harper did not employ the plug method of the patent, thus anticipating the patent. They cemented that well by placing about 200 feet of cement in the bottom of the well while the casing was off the bottom, then sinking the pipe into the cement.

In view of the testimony of Hearne Harper concerning Christian No. 1 well above quoted, we will indicate some of the other testimony before the court concerning the cementing of that well. A witness named George testified that they first attempted to use the siphon method, and the well blew out while the cement was in the hole and unset. Later they used a plug "that would fill up the hole that was below the 6″ casing." That they secured displacement by gas pressure "and then we cemented and put the plug in and put cement in on top of it and pumped it to the bottom. We could pump around the 6-inch but we couldn't just plug it up. By putting the plug at the bottom it filled the hole below and put it behind all of this 6-inch casing."

The witness McDuffie testified to the use of a plug on top of the cement. The witness Pyle testified he did not see them put any cement in the well, but he worked at night; that there was no cement in the well at the time it blew out. Roger Canfield, field superintendent of the Gulf Refining Company, upon whose property this well was drilled, testified that the casing leaked and settled. This would show that the casing was not cemented in any way, and the witness also testified that no attempt was made to cement that well. Appellee's witness Bird testified he was present at the time the casing was set on this well, and that no cement or plug was used in landing the casing or to shut off water. He testified that there was no cement at the well and that nothing was said about cementing it.

Without calling attention to other evidence tending to contradict and discredit the testimony of Hearne Harper, it is sufficient to say that his evidence is contradicted on so many points that the court was justified in rejecting it on other points where there was no direct contradiction.

There was no sufficiently clear, satisfactory, uncontradicted, or credible evidence, having due regard for the long period of time that had elapsed before this trial, which would justify or require a finding of prior use.

The appellant complains of the amount of the judgment based upon an allowance of $50 per well as a reasonable royalty. There was ample evidence to sustain the finding of the trial judge.

Decree affirmed.